UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 726-2 |
| v. ) | |
| ) | Hon. John R. Blakey |
| JEROME PACE ) | |

**UNITED STATES' OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND POSITION PAPER AS TO SENTENCING FACTORS**

Defendant Jerome Pace is guilty of a scheme to defraud the Illinois Department of Employment Security ("IDES") and the IRS out of hundreds of thousands of dollars. Between 2013 and 2015, defendant used dozens of stolen identities to repeatedly file and certify false claims and take government funds intended for others in need. A sentence of imprisonment within the guidelines range of 51 to 63 months is appropriate.

**I. DEFENDANT'S BACKGROUND AND OFFENSE CONDUCT**

The background is taken from the Presentence Investigation Report (PSR) and plea agreement (PA).

**A. Defendant's Personal Background and Criminal History**

Defendant has lived in the Chicago area his entire life. (PSR ¶¶ 79-80.) His parents were together for most of his childhood but eventually separated. (PSR ¶ 80.) The PSR and defendant's sentencing memorandum discuss the difficulties that defendant experienced growing up, including conflicts between his parents. Despite these challenges, defendant graduated high school in 2002. (PSR ¶ 99.)

1

At age 17, defendant was charged with retail theft on two occasions but not convicted. (PSR ¶ 56, 58.) The following year, at age 18, he was arrested again for retail theft and convicted of that offense, for which he received 6 months of supervision. (PSR ¶ 41.)

After that conviction, defendant continued his education, defendant received an associate's degree in business and certificate in home inspection in 2004 and 2005, respectively. (PSR ¶ 99.) In 2005, he worked for the United Parcel Service for approximately eight months. (PSR ¶ 104.) Over the next ten years, he worked as a promotor and event planner for night clubs. (PSR ¶ 103.)

Between 2004 and 2012, defendant continued to get in trouble with law. He was convicted of obstruction of a peace officer, aggravated fleeing, driving under the influence of alcohol, and two other driving offenses. (PSR ¶¶ 42-46.) During this same period, he was charged, but not convicted, of manufacture/delivery of cannabis, aggravated unlawful use of a weapon, domestic battery, theft, and numerous driving offenses. (PSR ¶¶ 59-70.)

Since 2015, defendant has been in a steady relationship, and he has a 13-year old daughter from a previous relationship. (PSR ¶¶ 83-84.) In 2016 and 2017, he was employed by Youth Advocate Programs with the Chicago Public Schools. (PSR ¶ 102.) In October 2017, defendant was shot in his arm and face, which caused hearing loss, numbness, and swallowing problems. (PSR ¶¶ 89-90.)

B.     **Offense Conduct**

Between 2013 and 2015, defendant used stolen identities of patients to file fraudulent unemployment insurance and tax refund claims. (PSR ¶ 8.) Defendant

obtained the personal identifying information, including names, addresses, dates of birth, and social security numbers from Ashley Weathersby, who is charged separately before Judge Lee in *United States v. Pitts, et. al.*, 18 CR 743, (N.D. Ill.). Weathersby worked at Health Care Provider A and stole the identities of its patients. (PSR ¶ 9.) Defendant also used stolen identities of Chicago public employees that defendant obtained from another source. (PSR ¶¶ 9, 13.)

### 1. The Unemployment Fraud Scheme

In the Spring of 2013, defendant and co-defendant Anthony Henry began purchasing the stolen identities from Weathersby. (PSR ¶ 9.) They used the stolen information to file claims with the Illinois Department of Employment Security. (*Id.*) IDES provides benefits to individuals in Illinois who have been terminated without fault for the period in which they were unemployed, able to work, and had been actively seeking work. (PA ¶ 6.) Between 2013 and 2015, defendant used the identities of at least 124 victims to file fraudulent unemployment claims. (PSR ¶ 10.) For each claim, defendant had to regularly certify unemployment eligibility over the phone or internet. (PA ¶ 6.) For some claims, defendant directed IDES to send pre-paid debit cards to addresses to which he and co-schemers had access. (PA ¶ 6.) Defendant and his co-schemers would then pick up those debit cards after they had been mailed out. (*Id.*) For other claims, defendant selected the direct deposit method of payment, and provided bank account routing information that was linked to debit cards that defendant had in the names of identity theft victims. (*Id.*) Once he had these IDES funded debit cards, defendant cashed in on the scheme by withdrawing money at ATMs or using them at point of purchase debit transactions. (*Id.*) The

3

scheme involved the tracking of the claims filed, regular certifications of unemployment for each of the victims, and the tracking of multiple addresses where the debit cards and payments were mailed. (PSR ¶ 13.)

The total amount of expected payout on the claims that defendant certified was $1,112,648. (PSR ¶ 10.) Of that amount, IDES paid out $120,181. (*Id.*) During the time period of the scheme, defendant lived with Henry at a house in Calumet City, Illinois. (PA ¶ 6.) IDES also paid out an additional $153,974 in claims from defendant or Henry, but the investigating agents could not determine which defendant had submitted those claims.[1] (*Id.*)

### 2. The Tax Fraud Scheme

In addition to the IDES scheme, defendant used the stolen identities to prepare and file fraudulent income tax returns. (PSR ¶ 11.) When filing the fraudulent Form 1040 tax return, defendant had to fill out the name and address, social security number, filing status, number and personal identifying information of dependents, sources and amounts of total income for the tax year, the amount of federal income tax withheld during the tax year, any credits for which the taxpayer was eligible, the amount of tax due or refund claims. (PA ¶ 6.) Like with the IDES scheme, defendant could choose to have their tax refund directly deposited to a bank account. (*Id.*)

Defendant used the identities of at least 53 victims to file refunds claiming the amount of $249,737, by making false representations related to the victims' income,

---

[1] The evidence of these identities was obtained during a search warrant of defendant and Henry's house, which is how investigators knew that one of them was using the identities to receive the $153,974 in additional payouts. (PSR ¶ 72.) In addition, the FBI was able to attribute $219,999 in additional payouts directly to Henry. (PSR ¶ 10.)

4

deductions, and payments. (PSR ¶ 11.) Based on those claims, the IRS paid out a total of approximately $33,144. (*Id.*) The IRS paid out an additional $18,279 in fraudulent refund claims that could not be attributed to either defendant or Henry, but were based on the stolen identities found in their house. (*Id.*)

## II. THE PSR GUIDELINE RANGE

The government makes the following objections and comments to the calculation of the guideline range in the presentence investigation report.

### A. Loss Amount

The Presentence Report relies on a total intended loss amount of $1,112,648, by combining the full potential payout of defendant's IDES claims with the total amount of tax refunds claims. (PSR ¶¶ 21-22.) In the plea agreement, however, the government agreed that the $120,181 in actual loss from the IDES fraud, rather than the $1,112,648 in intended loss, should control the guideline range. (PA ¶ 9(b)(ii).

But for the *Pitts* case, the government would agree with Probation that the $1,112,648 in intended loss should determine the total loss amount under Guideline § 2B1.1(b)(1). As explained in the government's version of the offense, however, Judge Lee ruled in the *Pitts* case that the actual loss to IDES should control the guidelines calculation with respect to that scheme. (R. 344-345 in Case No. 18 CR 743). As noted above, the defendants in the *Pitts* case obtained stolen identities from the same source (Weathersby) and executed nearly the same scheme as the defendants in this case. Defendants in both cases knew each other and shared information, but the

5

government charged defendant and Henry in a separate case.[2] Because the two cases were so intertwined, and the same evidence that Judge Lee heard on how IDES processed and terminated claims would be relied on in this case, the government has agreed to treat Judge Lee's ruling as the "law of the case" with respect to defendant's IDES claims.[3]

Therefore, in accordance with the plea agreement, the government's position is that the total loss amount is $369,918, consisting of the $120,181 in actual loss from the IDES fraud and $249,737 in intended loss from the tax fraud.

**B.     Sophisticated Means**

Guideline § 2B1.1(b)(10)(C) provides a two-level increase in a defendant's offense level if the fraud "involved sophisticated means." The commentary to that provision defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, application note 9(B). The PSR concludes that although the scheme was "intricate and required a form of organization," it does not rise to the level of sophisticated means. (PSR ¶¶ 24-25.)

Whether the fraud's means were sophisticated depends on "the level of planning or concealment in relation to typical fraud of its kind." *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015). A "brilliant scheme" is not required; one

---

[2] For example, a defendant in the Pitts case, Yoshimi Henry, is Anthony Henry's sister.

[3] To be clear, the government respectfully disagrees with Judge Lee's ruling, and reserves the right to take a position contrary to that ruling in future cases. In fact, in this case the government has taken the position that intended loss controls with respect to the tax claims, and agrees with the PSR on that point, because Judge Lee's ruling did not address that issue.

6

that displays a greater level of concealment than the average case will suffice. *United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006).

Defendant's offense involved (1) obtaining the stolen identities from Weathersby and another source; (2) using the identities to fill out the claims to both IDES and the IRS; (3) requesting that debit cards be sent to different addresses; (4) arranging to pick up those cards at the different addresses; (5) using the direct deposit method of payment on existing debit cards. The use of varying addresses and methods of payment helped conceal a pattern of fraud. In addition, defendant had to keep detailed records of his activities given the number of identities (124 for IDES and 53 for IRS), and the lengthy time period of the fraud. When his records were found in a search warrant, he had an alternative explanation for them—that he was merely a mule for someone else. (PSR ¶ 72.)

When compared to other cases where the enhancement has been applied, defendant's conduct meets the threshold for sophisticated means. *United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (affirming application of sophisticated means enhancement where scheme spread over two states, involved false loan applications, and used false documents to support the misinformation contained in the loan applications); *United States v. Robinson*, 538 F.3d 605, 607 (7th Cir. 2008) ("[D]efendant's use of fictious entities, doctored fax headers, and phony contact information satisfied the requirements for sophisticated means"). In *United States v. Sykes*, 774 F.3d 1145 (7th Cir. 2014), the Seventh Circuit affirmed the application of the sophisticated means enhancement where, as a part of a check-kiting scheme, the

7

defendant and her co-schemers created a "a variety of complex counterfeit documents for a number of fake corporations" and the scheme "involved … coordinating time-sensitive conduct among numerous coconspirators" and "required deceiving numerous banks and business bankers, who presumably had a good deal of skill in this area." *Id.* at 1153.

Defendant's scheme, which involved knowing the complexities of the IDES and IRS claim submission system, tracking dozens of identities and false claims at a time, using multiple addresses and methods of payment to avoid detection, and cashing out a series of debit cards, should likewise receive a sophisticated means enhancement under Section 2B1.1(b)(10)(C).

### C. Defendant's Criminal History Score

The government also notes that defendant's criminal history score of four, and category of III was not anticipated in the plea agreement. From the government's review of the PSR, that calculation appears to be correct, and defendant does not contest it. (R. 93 at 23.) With a total offense level of 22, and a criminal history category of III, defendant's guidelines range is 51 to 63 months' imprisonment.

### III. A SENTENCE WITHIN THE GUIDELINES RANGE IS APPROPRIATE

Criminal sentencing has four purposes – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the particular sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range

set by the Sentencing Guidelines, and another is the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586, 596 (2007). Here, a careful consideration of the § 3553(a) factors weighs in favor of a sentence within the advisory guidelines range of 51 to 63 months' imprisonment.

> A. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Sentence Within the Guidelines Range**
>
> 1. **Nature and Circumstances of the Offense**

The nature and circumstances of the offense are very serious for at least two reasons. *First*, the scheme – and defendant's role in it – involved fraudulently obtaining IDES funds, money that was intended to support individuals in Illinois who were unemployed and needed IDES assistance to replace lost income. Fraud on IDES diverts money from legitimate claimants – people who have lost their jobs – to people, like defendant, who have no legitimate claim to the funds. Ultimately, that fraud adds significant costs for IDES and Illinois taxpayers, and impacts the operation of the entire system of unemployment benefits. *See United States v. Wilson*, 960 F.2d 48, 50–51 (7th Cir. 1992) ("Prosecuting those who defraud state unemployment compensation programs is an important means for protecting the government's investment by ensuring that those programs are run with a minimum of waste and fraud."). Defendant's defrauding of the IRS likewise fell on the backs of other

9

taxpayers and the public in general, including those who need to rely on federal programs for assistance.

*Second*, and equally as importantly, defendant knowingly participated in a scheme to defraud IDES using the names and information of unsuspecting identity theft victims. He also used IDES debit cards in the names of multiple people he did not know to withdraw funds from ATM machines. Defendant knew, or reasonably should have known, that those names were the names of real people whose identities were stolen in order to allow him and his co-schemers to fraudulently obtain significant amounts of cash.

Defendant's conduct was very serious, and demands a serious sentence. Defendant's offense was a crime not only of greed, but of deception and a callous disregard of consequences that could result to individuals and an entire system established to assist people in the community. Accordingly, the seriousness of the offense demands a Guidelines sentence.

### 2. Defendant's History and Characteristics

The Court is also required to consider, under 18 U.S.C. § 3553(a), the defendant's history and characteristics. Defendant's sentencing memorandum outlines several mitigating factors in defendant's history—his upbringing, his relationship with his family, the tragic shooting that he suffered, and his time incarcerated during the pandemic.

Without minimizing any of those aspects of defendant's life, they do not justify a below-guidelines sentence. First, this is not defendant's first brush with the law. He has previously convictions, including for theft, and numerous arrests. His

previous experience with law enforcement should have provided the "wake up call" that would have prevented the lengthy period of fraud that he engaged in, yet it did not. Defendant's education and employment record shows that he is an intelligent person who had other opportunities in life, yet he chose to steal money from government programs.

Second, defendant's mitigation presentation does not justify a departure from the guidelines because he has already received favorable breaks in the guidelines calculation. First, defendant is not held accountable for claims submitted by co-defendant Henry, even though they were living in the same house and engaging in the same scheme. He is also not held accountable for claims that could not be attributed to either him or Henry because the stolen identities were intermingled among the two defendants.

Finally, defendant is not being held accountable for the intended loss of the IDES scheme, even though the government would otherwise seek that higher guideline enhancement. The government does so to avoid unwarranted disparities in the guidelines calculations between this case and the *Pitts* case, given that they are overlapping schemes. That factor alone reduces defendant's guidelines by two levels, if the Court agrees with the government's position. Given the conservative method the government used in calculating the guidelines range, the guidelines range does not overstate the seriousness of the offense and his mitigating circumstances do not support a below-guidelines sentence.

## B. Deterrence and Respect for the Law

In addition to evaluating the nature of offense and the history and characteristics of the defendant, section 3553(a)(2)(A)-(C) requires that a sentence "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." Here, a sentence within the applicable Guidelines range is necessary under section 3553(a) because anything less will denigrate the seriousness of defendant's offenses, will not promote respect for the law by defendant or other would-be offenders, will not provide just punishment for the offenses, and will not protect the public from further crimes by the defendant.

Had this fraud not been discovered by law enforcement, it likely would have continued indefinitely, harming more and more individuals, the IDES unemployment benefit system, and the federal treasury upon which so much depends. Without a significant sentence, defendant and others like defendant will fail to appreciate the harm this type of crime causes to institutions and individuals, and will continue to see the allure of fraudulently obtained money. The amount of government money that has been distributed during the pandemic has only confirmed the need to vigilantly protect it for who it is intended for. A guideline sentence will recognize that by promoting respect for the law and providing just punishment for the offense.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant within the Guidelines range, and order a three-year period of supervised release consistent with the goals of criminal punishment.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
UNITED STATES ATTORNEY

By: /s/ *Charles W. Mulaney*
CHARLES W. MULANEY
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 469-6042

Dated: January 26, 2022